WILMER CUTLER PICKERING
  HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
ALLISON BINGXUE QUE (SBN 324044)
STEPHANIE M. TEUBER (SBN 332995)**
sonal.mehta@wilmerhale.com
allison.que@wilmerhale.com
stephanie.teuber@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

ARI HOLTZBLATT*
ROBIN C. BURRELL*
ari.holtzblatt@wilmerhale.com
robin.burrell@wilmerhale.com
1875 Pennsylvania Ave, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
*Pro hac vice to be submitted
**N.D. Cal. admission pending

RYANNE E. PERIO*
ryanne.perio@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 295-6325
Facsimile: (212) 230-8888

Attorneys for Plaintiff Meta Platforms, Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND/SAN FRANCISCO DIVISION

| | |
|---|---|
| META PLATFORMS, INC., a Delaware corporation,<br><br>                 Plaintiff,<br><br>        v.<br><br>BRIGHT DATA LTD., an Israeli corporation,<br><br>                 Defendant. | Case No. _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Meta Platforms, Inc. ("Meta") alleges the following:

## INTRODUCTION

1.     Since at least April 2021 and continuing to the present, Defendant Bright Data Ltd. ("Bright Data" or "Defendant") has operated an unlawful business designed to use automation software to improperly collect or "scrape" and sell data from Meta websites, including Facebook and Instagram, and other websites such as Twitter, Amazon, Airbnb, LinkedIn, Etsy, and Bing.

2.     *First*, Defendant developed and used unauthorized automation software to scrape data from Facebook and Instagram, including users' profile information, followers, and posts that users have shared with others.  *Second*, Defendant advertised the sale of data scraped from Instagram and Facebook.  For example, Defendant offered to sell the Instagram data set for $860,000, or in customized subsets for no less than $5,000.  *Third*, Defendant developed, tested, and sold tools and services that enable others to scrape data from Facebook and Instagram and to avoid detection by Meta and other websites.

3.     Defendant's conduct was not authorized by Meta, and it violated several Facebook and Instagram terms and policies.  On November 29, 2022, Meta notified Defendant of its breach and demanded that Defendant permanently cease its unlawful conduct, but Defendant refused.  Meta brings this action for damages and to stop Defendant's violations of Facebook's and Instagram's terms and policies.

## PARTIES

4.     Plaintiff Meta is a Delaware corporation with its principal place of business in Menlo Park, San Mateo County, California.  Meta operates, among other products, Facebook and Instagram.

5.     Defendant Bright Data was incorporated in Israel on March 16, 2008 as Zon Networks Ltd. and changed its name to Bright Data Ltd. on March 14, 2021.  Bright Data has its principal place of business at 4 Hamahshev St., Netanya 4250714, in Israel.  Bright Data maintains an office at L415 Mission Street, 37th Floor, in San Francisco, California.

6.     Defendant operates the website brightdata.com, where it sells data scraped from various websites, including Facebook, Instagram, Twitter, Amazon, Airbnb, LinkedIn, Etsy, and

Bing, among others, and scraping tools and services, including tools that Bright Data specifically designed to scrape data from Facebook and Instagram.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction under 28 U.S.C. § 1332 over the causes of action alleged in this Complaint because complete diversity exists, and the amount in controversy exceeds $75,000.  Defendant Bright Data is incorporated in Israel with its principal place of business in Israel, while Plaintiff Meta is incorporated in Delaware with its principal place of business in California.

8.      Defendant operates or operated multiple Facebook accounts and thereby agreed to Terms of Service that govern the use of Facebook ("Facebook Terms") and Meta's Commercial Terms.  The Court has personal jurisdiction over Defendant because Facebook's Terms and Meta's Commercial Terms both contain a forum selection clause that requires this Complaint be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and that Defendant submit to the personal jurisdiction of either of those courts.

9.      Defendant also operates or operated multiple Instagram accounts and thereby agreed to the Instagram Terms of Use ("Instagram Terms").  The Court has personal jurisdiction over Defendant because Instagram's Terms also contain a forum selection clause that requires this Complaint be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and that Defendant submit to the personal jurisdiction of either of those courts.

10.     In addition, the Court has personal jurisdiction over Defendant because Defendant knowingly directed and targeted its conduct at California and at Meta, which has its principal place of business in California.  Defendant also maintains an office in San Francisco, California.

11.     By agreeing to the forum selection clause in Facebook's Terms, Meta's Commercial Terms, and Instagram's Terms, Defendant agreed that this Court is the proper venue for this matter.

12.     Moreover, venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as the

threatened and actual harm to Meta occurred in this District.

13.     Pursuant to Civil L.R. 3-2(d), this case may be assigned to either the San Francisco or Oakland division because Meta's headquarters is located in San Mateo County.

## FACTUAL ALLEGATIONS

**A.     Background on Meta Products**

14.     Meta operates Facebook, a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices.  As of September 30, 2022, Facebook daily active users averaged 1.98 billion, and monthly active users averaged 2.96 billion.

15.     Meta also operates Instagram, a photo and video sharing service, website, and mobile application.  Instagram users can post photos and videos to their profile.  They can also view, comment on, and like posts shared by others on Instagram.  The Instagram service is a Meta product.

16.     To view and interact with most content on Facebook and Instagram, users must create an account and login using that account.  A user that is not logged into Facebook or Instagram through an account can only view a limited amount of content before the user is redirected to a login screen.

17.     To create a Facebook account, Meta requires each user to register with their name, email or mobile phone number, password, date of birth, and gender.  To create an Instagram account, Meta requires each user to register with their email address and to create a username and password.  Registered users can create user profiles and include information about themselves, including their email address, phone number, and date of birth.  Registered Facebook users can make connections on Facebook by becoming "friends" with other Facebook users, and Instagram users can "follow" other Instagram users.

18.     Meta provides Facebook and Instagram users control over how to customize their profiles and how much personal information to include in their profiles.

19.     Meta has approved means for Facebook and Instagram users to share data with third parties, such as through designated Application Programming Interfaces ("APIs").  Meta permits

COMPLAINT; DEMAND FOR JURY TRIAL

third parties, such as authorized developers and businesses, to use certain APIs to access data from the Facebook and Instagram platforms, with appropriate user consent.  Among other restrictions, these third parties must agree to abide by Facebook and Instagram's Terms and Meta's Platform Terms.

**B.**   **Meta and Instagram Terms and Policies**

20.   Everyone who creates a Facebook account or otherwise uses Facebook agrees to Facebook's Terms (available at https://www.facebook.com/terms.php) and other rules that govern access to and use of Facebook (collectively "Facebook's Terms and Policies").  Facebook's Terms and Policies inform users that the Terms "govern your use of Facebook" and that "[o]nce any updated Terms are in effect, you will be bound by them if you continue to use our Products."

21.   Everyone who "create[s] an Instagram account or use[s] Instagram" agrees to the Instagram Terms (available at https://help.instagram.com/581066165581870) and to other rules that govern access to and use of Instagram, including Instagram's Community Guidelines and Platform Policy (collectively, "Instagram Terms and Policies").

22.   Section 3.2.1 of the Facebook Terms prohibits users from doing anything "[t]hat violates these Terms" or that is "unlawful, misleading, [ ] or fraudulent," and from facilitating or supporting others in doing so.

23.   The Instagram Terms prohibit users from "violat[ing] (or help[ing] or encourag[ing] others to violate) these Terms or our policies" and from "do[ing] anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose."

24.   Section 3.2.2 of the Facebook Terms prohibits users from "do[ing] anything that could … impair the proper working or appearance of [Facebook]" or from "facilitat[ing] or support[ing] others in doing so."

25.   The Instagram Terms also prohibit users from "do[ing] anything to interfere with or impair the intended operation of [Instagram]."

26.   Section 3.2.3 of the Facebook Terms prohibits "access[ing] or collect[ing] data from [Facebook] using automated means (without our permission) or attempt[ing] to access data you don't have permission to access" or from "facilitat[ing] or support[ing] others in doing so."

27.     Section 3.2.5 of the Facebook Terms prohibits "sell[ing], licens[ing], or purchas[ing] any data obtained from us or our services" or from "facilitat[ing] or support[ing] others in doing so."

28.     The Instagram Terms also prohibit (a) "access[ing] or collect[ing] information in unauthorized ways … [including] collecting information in an automated way without our express permission;" and (b) "sell[ing], licens[ing], or purchas[ing] any account or data obtained from us or our Service."

**C.      Background on Automated Scraping**

29.     Scraping is a form of data collection that relies on unauthorized automation for the purpose of extracting data from a website or app.  Scraping can be either "logged-in" or "logged out."  Logged-in scraping involves scraping of data that is behind a password-protected website. Logged-out scraping involves scraping of data that is viewable without a password, but may still be subject to restrictions on access, use, and rate and data limits.

30.     To combat scraping and other abuse, Meta proactively uses a combination of technological measures designed to control access to Facebook and Instagram and to detect and disrupt unauthorized automated access.  Software and other technology that is designed to circumvent these restrictions against automation can make websites less secure and can often be used for other harmful acts, like coordinated inauthentic behavior, fake reviews, or submitting fraudulent requests.

        a.      Rate and Data Limits.  Meta employs rate and data limits to control access to certain data and prevent scraping.  Rate limits cap the number of times anyone can interact with Meta computers in a given amount of time.  Data limits restrict how many times certain types of data can be viewed by a user.  Once a user reaches a rate or data limit, Meta will block a user's ability to access certain content.  Meta blocks billions of suspected scraping actions per day across Facebook and Instagram using these measures.

        b.      Registration.  Meta requires users to create and log in to an account to access certain information and features on Facebook and Instagram.  Meta monitors for the automated creation of accounts and blocks the registration of an account when the process of

creating the account appears suspicious or automated, or when the same IP address is known to have previously engaged in scraping.  Meta also uses a lockout mechanism to limit access to content on Facebook and Instagram when people without accounts or who are not logged into their accounts try to access it.  Meta's lockout mechanism redirects users to a login screen to either create an account or log into an existing account after they view a certain amount of information or if they attempt to engage with the content (for example, like or comment on a photo).  People without Facebook or Instagram accounts or who are not logged into their accounts are able to view only content that users have permitted everyone to see; content that is set to private or limited to specific friends or audiences is not viewable by logged out users.

          c.      <u>Confirmation</u>. After registering, Meta requires Facebook and Instagram users to respond to an email or text message Meta sends to the contact information provided during registration.  Meta also limits the number of user accounts that can share the same phone number or email address.

          d.      <u>Post-Registration Monitoring for Suspicious Activity</u>.  Facebook and Instagram apply machine-learning models, using user-agent strings and other information, to detect accounts engaged in suspicious activity, such as inauthentic behavior, compromised accounts, and automated accounts after registration.  If an account is flagged for suspicious activity on Facebook and Instagram, Meta may ask the user to enter a phone number, confirm a code sent to the registration email, or ask the user to respond to various technical tests or "checks," including reCAPTCHA, to confirm the user is a human.  Similarly, Instagram also uses machine learning and other tools to help identify accounts engaged in inauthentic activity (i.e., likes, follows, and comments). These accounts may be temporarily or permanently blocked from accessing Facebook and Instagram.  For example, between January and March of 2022, Meta identified and took enforcement actions against 1.6 billion fake accounts.

          e.      <u>Post-Registration Monitoring for Scraping</u>.  Meta also uses machine-learning models and other tools to detect and block users engaged in scraping based on use patterns that are inconsistent with a human user.  Meta also identifies and blocks IP addresses known to be used to scrape data.

**D.    Defendant Accepted Meta's and Instagram's Terms and Policies**

31.    At all relevant times, Defendant was bound by Facebook's and Instagram's Terms and Policies.

32.    Between December 23, 2015 and January 6, 2023, Defendant, through its agents and employees, created and maintained at least 17 Facebook user accounts.  For example:

a.    On December 23, 2015, Defendant created a Facebook user account with the username "Dan Luminati."

b.    On March 1, 2022, Defendant created a Facebook user account with the username "BD Mar."

c.    On July 26, 2022, Defendant created a Facebook user account with the username "Irina BrightData."

d.    On August 17, 2022, Defendant created a Facebook user account with the username "Sarir Bright."

33.    Between October 30, 2017 and January 6, 2023, Defendant, through its agents and employees, also created and maintained at least 16 Instagram accounts.  For example:

a.    On October 30, 2017, Defendant created Instagram accounts with the username "omri_orgad."

b.    On March 14, 2019, Defendant created an Instagram account with the username "bright_data."

c.    On December 3, 2019, Defendant created an Instagram account with the username "support5410."

d.    On December 22, 2021, Defendant created an Instagram account with the username "brightpiggybox."

e.    On July 26, 2022, Defendant created an Instagram account with the username "irina_brightdata."

34.    Defendant, through its agents and employees, created and maintained at least two Business Manager accounts, at least eight advertising accounts, and at least eleven Facebook Pages.

35.     Defendant used its Facebook and Instagram accounts to promote its automated scraping services, tools, and scraped data sets as set forth in Figures 1 and 2 below.

**Figure 1:  December 22, 2022 Bright Data Advertisement on Instagram**



*See* Exhibit 1.[1]

---

[1]     Exhibits attached to this Complaint have been labeled with identifying information.  Exhibit 8 includes an annotation.

8

1

**Figure 2:  December 22, 2022 Bright Data Advertisement on Facebook**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



22

*See* Exhibit 2.

23

**B.    Defendant's Automated Scraping Activity**

24      36.    Since at least April 2021, and continuing to the present, Defendant has used

25  automated means to scrape and facilitate the scraping of data from Facebook and Instagram.

26  Defendant took several steps to scrape and facilitate the scraping of data from Facebook and

27  Instagram.  *First*, Defendant developed, maintained, and sold scraping software designed to scrape

28  Facebook and Instagram.  *Second*, Defendant offered to scrape data directly from websites on

COMPLAINT; DEMAND FOR JURY TRIAL

behalf of its customers, without the customer having to purchase Defendant's scraping software. *Third*, Defendant sold data scraped from various websites, including Facebook and Instagram, among others. *Fourth*, Defendant set up and sold access to scraping infrastructure, in the form of IP addresses and servers, used to scrape data from Facebook and Instagram and, on information and belief, to avoid Meta's technological measures that were designed to detect and disrupt scraping on Facebook and Instagram.

     *i.*    *Defendant's Automated Scraping Tools*

    37.    Defendant developed, maintained, and sold access to automation software—the Web Scraper IDE tool, a Facebook Scraper, and an Instagram Scraper—used to scrape data from Facebook and Instagram. Defendant sold and distributed its automation software on its website, brightdata.com.

    38.    As shown below in Figure 3, Defendant promoted the Data Collector tool as "the world's #1 web scraper" that offered the ability "instantly extract publicly available data from any website."

**Figure 3: Screenshot of Bright Data's Data Collector Offer on July 7, 2022**





Scrape web data at scale with zero infrastructure

Instantly extract publicly available data from any website with Data Collector, the world's #1 web scraper.

Start Free Trial >

*See* Exhibit 6.

    39.    As shown below in Figure 4, Defendant developed a Facebook Scraper to

1   automatically scrape information from Facebook, including user profile information, Facebook

2   posts and user engagement and comments, and data related to Facebook Groups, among other

3   information.

4   **Figure 4: Screenshot of Bright Data's Facebook Scraper Offer on September 28, 2022**



*See* Exhibit 3.

15      40.     As shown below in Figure 5, Defendant also developed an Instagram Scraper to

16   scrape information from Instagram, including users' profile information and posts.

17   **Figure 5: Screenshot of Bright Data's Instagram Scraper Offer on October 5, 2022**



*See* Exhibit 4.

27      41.     Defendant maintained the Facebook and Instagram Scraper and updated its code in

response to changes Meta made to the Facebook and Instagram website that prevented Defendant's scraping.  *See* Exhibit 3.

42.     To use Defendant's scraping software, a customer first has to log in to Defendant's website.  As shown below in Figure 6, once logged in, Defendant designed its scraping software so that a customer would only need to select the type of data to be scraped from Instagram or Facebook using one of Defendant's existing data scrapers.

**Figure 6: Available Facebook Scrapers as of April 27, 2021**



*See* Exhibit 5.

43.     Once a customer used Defendant's automation software to select the type of data from Facebook or Instagram to be scraped, Defendant launched the scraping campaigns from its computer network and infrastructure and scraped the data for the customer.  Customers could also use Defendant's software to schedule scraping campaigns to occur in automated intervals, and

COMPLAINT; DEMAND FOR JURY TRIAL

those would be initiated and executed by Defendant based on the frequency the customer selected. Defendant caused the data to be scraped by and saved to Defendant's computer system and then delivered to the customer as the customer directed.

  *ii. Defendant's Scraping Service*

  44. In addition to its scraping software, Defendant offered a full-service scraping option where Defendant's employees and agents used Defendant's computers, IP addresses, and automated scraping software to scrape data from websites, including Facebook and Instagram, on behalf of and for the benefit of its customers.

  45. For example, as of July 7, 2022, Defendant offered on its website "Managed Data Collection Services," meaning Defendant would perform all aspects of the scraping operations without requiring the customer to use Defendant's scraping software.  Defendant described the service as "a personalized collection service for companies who prefer to focus on using the [scraped] data and not be involved in the operation."  *See* Exhibit 6.  As of December 30, 2022, Defendant's website states "Let us know what dataset you need and we'll create it for you."

  *iii. Defendant's Scraped Data Sets*

  46. Defendant sold pre-collected sets of data it scraped from the sites of several major U.S. and international companies, including Amazon, Walmart, Target, Ali Express, TikTok, LinkedIn, Glassdoor, Indeed, eBay, Etsy, Rakuten, Wish, Shein, Grubhub, Costco, Lowes, Home Depot, Best Buy, Kroger, Selfridges, Chewy, and Nordstrom.

  47. As shown in Exhibits 7 and 8, as of no later than November 17, 2022, on its website, Defendant offered to sell scraped data from Instagram users.  Defendant offered to sell a data set for $860,000 and also offered to sell subsets of the data.  Defendant charged a minimum price of $5,000 for a subset of the Instagram data and charged an additional $0.001 per incremental record.

  48. According to Defendant's website, "popular" subsets of the data include Instagram Business Accounts, Instagram Influencers, and Instagram Active Users.  *See* Exhibit 7.

  49. Defendant published a sample of the data it scraped from Instagram on its website. According to the data in the sample, the Instagram data Defendant offered to sell and, on information and belief, sold, included at least 34 total fields scraped from Instagram users' profiles,

including full name, ID, country code, region, post count, biography, business category, hashtags, followers, following, posts, profile image, highlights, verification status, business email, and business addresses.

50.   Defendant offered several options for delivery method and frequency, including daily delivery.

51.   On information and belief, Defendant obtained the Instagram data set by scraping it from Instagram.

52.   Defendant also offered for sale on its website a set of pre-collected data scraped from Facebook.  On information and belief, Defendant obtained this set of data by scraping it from Facebook.

    *iv.*   *Defendant's Anti-Detection and Blocking Technology*

53.   Proxies are intermediary servers that re-route a user's internet traffic to conceal the user's true IP address and location.  As shown below in Figure 7, Defendant sells access to a full suite of proxy services, including residential and mobile proxies.  Defendant also sold access to "Facebook proxies" and "Instagram proxies."  *See* Exhibits 9-10.  Defendant charged between $500 per month to $2,000 per month to use its proxies.  Defendant also offers a "custom" subscription at a custom price.

**Figure 7: Bright Data Proxy Services as of November 17, 2022**



*See* Exhibit 12.

54.   Defendant encouraged its customers to use its proxy services to scrape data from

Facebook, including by (i) "creat[ing] & manag[ing] multiple Facebook accounts without getting flagged," (ii) "unblock[ing] Facebook in any country in the world," and (iii) circumventing Facebook's detection mechanisms by, for example "chang[ing] IP location as often as needed."

55.     Defendant also encouraged its customers to use its proxy services to scrape data from Instagram, including by promising that customers will "never get blocked while collecting Instagram influencer data" and that they can navigate Instagram "completely undetected." *See* Exhibit 10.

56.     In order to automate the extraction of data, avoid detection, and avoid Meta's anti-scraping measures, Defendant used an automation program to rotate IP addresses, unblock CAPTCHA, manipulate protocols, and manage headers, digital fingerprints, and user agents, when connecting to Facebook and Instagram websites.

**Figure 8: Screenshot of Defendant's Circumvention Methods as of April 27, 2021**



*See* Exhibit 13.

57.     On information and belief, Defendant took these steps to evade Meta's detection systems, which are designed to identify unique browsers, require users to log in with accounts, restrict how many times certain data is viewable and can be requested by a logged out user                     , and limit the number of times a user can interact with Meta computers in a set amount of time.

58.     Defendant's scraping activity and sale of scraped Instagram and Facebook user

15

information was not authorized by Meta.

**C.** **Meta's Enforcement Efforts**

59. On November 29, 2022, Meta conducted a video conference with Defendant and sent an email demanding that Defendant remove and cease the selling of any user data obtained from Facebook and Instagram, remove and disable any access to existing datasets of Meta users' data, and stop scraping and facilitating the scraping of Meta users' data. *See* Exhibit 11.

60. On January 6, 2023, Meta sent Defendant a letter reminding Defendant of the existence and terms of the Facebook and Instagram Terms and highlighted, in particular, that Defendant's use of Facebook and Instagram to scrape user data bound it to each platform's Terms, regardless of whether Defendant maintained an active account on that platform. Meta demanded that Defendant remove and cease the selling of any user data obtained from Facebook and Instagram, remove and disable any access to existing data sets of Facebook users' and Instagram users' data, and stop scraping and facilitating the scraping of Facebook users' and Instagram users' data. *See* Exhibits 14-15.

**D.** **Defendant Unjustly Enriched Itself and Harmed Meta**

61. Defendant's violations of the Facebook and Instagram Terms and Policies have harmed Meta.

62. Defendant's unauthorized use of Meta's computers, computer system, and computer network has damaged Meta, including but not limited to the time and money spent investigating and mitigating Defendant's conduct, in an amount to be determined at trial, and in excess of $75,000.

63. Since at least April 2021, Defendant has unjustly enriched itself at Meta's expense in an amount to be determined at trial. Meta is entitled to an accounting by Defendant and a disgorgement of all unlawful profits gained from its conduct.

### FIRST CAUSE OF ACTION

(Breach of Contract)

64. Meta realleges and incorporates all preceding paragraphs here.

65. Since at least December 23, 2015, Defendant, through its employees and agents,

16

created and used multiple Facebook user accounts and Instagram accounts, thereby agreeing to the Facebook Terms and the Instagram Terms.  Facebook's and Instagram's Terms and Policies constitute valid and enforceable agreements between Defendant and Meta.

66.     Meta has performed all conditions, covenants, and promises required of it in accordance with Facebook's and Instagram's Terms and Policies.

67.     Since at least April 2021, and continuing to the present, Defendant has used automated means to scrape and facilitate the scraping of information from Facebook and Instagram, including by: (i) developing, maintaining, and selling scraping software designed to scrape data from Facebook and Instagram; (ii) offering to scrape data for its customers without the customer having to purchase Defendant's scraping software; (iii) selling data that Defendant scraped from Facebook and Instagram; and (iv) setting up and selling access to scraping infrastructure, in the form of IP addresses and servers, used to scrape data from Facebook and Instagram and avoid detection by Meta.

68.     Defendant has breached and continues to breach Instagram's Terms and Facebook's Terms 3.2.1, 3.2.2, 3.2.3, and 3.2.5, which prohibit (i) using automated means without Meta's permission to scrape data from Facebook and Instagram, (ii) facilitating others to scrape data from Facebook and Instagram without Meta's permission, and (iii) selling data obtained from Facebook or Instagram.

69.     Defendant's breaches have caused Meta to incur damages, including investigative costs, in an amount to be proven at trial.

70.     Meta likewise seeks injunctive relief.  As a direct result of Defendant's unlawful actions, Meta has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendant's actions are enjoined.

71.     Defendant's acts as alleged herein also constitute unjust enrichment of Defendant at Meta's expense.

72.     Defendant received a benefit by profiting from its unauthorized use of Meta's computers, computer system, and computer network.  But for Defendant's wrongful, unauthorized, and intentional use of Facebook and Instagram, it would not have obtained such profits.

73.     Defendant's retention of the profits derived from its unauthorized use of Meta's computers, computer system, and computer network would be unjust.

74.     Defendant's unauthorized use of Meta's computers, computer system, and computer network has damaged Meta, including but not limited to the time and money spent investigating and mitigating Defendant's unlawful conduct.

75.     Meta seeks an accounting and disgorgement of Defendant's ill-gotten profits in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

(Tortious Interference with Contract)

76.     Meta realleges and incorporates all preceding paragraphs here.

77.     All Facebook and Instagram users must agree to the Facebook and Instagram Terms, respectively.   The Facebook and Instagram Terms constitute a valid and enforceable agreement between Facebook and Instagram users and Meta.

78.     Defendant is aware that the Facebook and Instagram Terms govern Facebook and Instagram users' use of Facebook and Instagram, respectively.   As a Facebook and Instagram user itself, Defendant agreed to and was bound by the Facebook and Instagram Terms.

79.     Because Defendant advertises its commercial data scraping service and software to Facebook and Instagram users logged into Facebook and Instagram, Defendant is aware that the customers to whom it sells its software and services have Facebook and Instagram accounts and are bound by the Facebook and Instagram Terms.

80.     By offering services and tools designed to scrape data from Facebook and Instagram in violation of the Facebook and Instagram Terms, Defendant induced a breach or disruption of the Facebook and Instagram Terms by other Facebook and Instagram users.

81.     On information and belief, Defendant's customers utilized Defendant's services and tools to scrape data from Facebook and Instagram in violation of the Facebook and Instagram Terms.

82.     Defendant's breaches have caused Meta to incur damages in an amount to be proven at trial.

COMPLAINT; DEMAND FOR JURY TRIAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Meta seeks a judgment awarding the following relief:

  a.  Injunctive relief enjoining and restraining Defendant and its agents from accessing and using Facebook and Instagram;

  b.  Injunctive relief requiring Defendant to identify the location of any and all data obtained from Facebook and Instagram, to delete such data, and to identify any and all entities with whom Defendant shared such data;

  c.  Injunctive relief enjoining and restraining Defendant and its agents from soliciting and facilitating others to scrape data from Facebook and Instagram;

  d.  Injunctive relief enjoining and restraining Defendant from developing, distributing, and using and enabling others to use technologies and products designed to scrape data from Facebook and Instagram without first obtaining Meta's express permission;

  e.  Injunctive relief requiring Defendant to identify all its customers that scraped data from Facebook and Instagram;

  f.  Injunctive relief enjoining and restraining Defendant and its agents from offering for sale or selling any data obtained from Facebook or Instagram;

  g.  Compensatory damages in an amount to be proven at trial;

  h.  Pre- and post-judgment interest as allowed by law;

  i.  An accounting of Defendant's profits resulting from its scraping activity;

  j.  Disgorgement of Defendant's profits resulting from its scraping activity; and

  k.  All other equitable and legal relief the Court deems just and proper.

COMPLAINT; DEMAND FOR JURY TRIAL

**PLAINTIFF RESPECTFULLY DEMANDS A JURY TRIAL.**

DATED: January 6, 2023                    Respectfully submitted,

                                          WILMER CUTLER PICKERING
                                             HALE AND DORR LLP

                                          By:  */s/ Sonal N. Mehta*
                                          SONAL N. MEHTA
                                          ARI HOLTZBLATT*
                                          RYANNE E. PERIO*
                                          ROBIN C. BURRELL*
                                          ALLISON BINGXUE QUE
                                          STEPHANIE M. TEUBER**

                                          *Attorneys for Plaintiff Meta Platforms Inc.*

                                          *Pro hac vice to be submitted*

                                          ** *N.D. Cal. admission pending*

                                          Platform Enforcement and Litigation
                                          Meta Platforms, Inc.

                                          Jessica Romero
                                          Michael Chmelar
                                          Sarah Prutzman
                                          Gabriella Orem

COMPLAINT; DEMAND FOR JURY TRIAL